UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------ x
                                           :
AKIRA KEATON                               :        3:19 CV 1487 (RMS)
                                           :
V.                                         :
                                           :
ANDREW SAUL, COMMISSIONER                  :
OF SOCIAL SECURITY                         :        DATE: SEPTEMBER 15, 2020
                                           :
------------------------------------------------------ x
```

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A
HEARING, AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ("SSA") denying the plaintiff

disability insurance benefits ("SSDI") and Supplemental Security Income benefits ("SSI").

I.      ADMINISTRATIVE PROCEEDINGS

The plaintiff, Akira Keaton, filed an application for SSDI and SSI on October 19, 2016,

claiming that she had been disabled since May 9, 2016 due to scoliosis with a history of surgical

repair in 1996, at the age of 12, and a second surgical repair on May 9, 2016, and Graves' disease.

(*See* Doc. No 16, Certified Transcript of Administrative Proceedings, dated November 21, 2019

["Tr."] 208-09, 213-21; *see also* Tr. 77-78, 95-96).   The plaintiff's applications were denied

initially and upon reconsideration (Tr. 116-19, 121-23, 126-28, 130-32), and on April 18, 2018, a

hearing was held before Administrative Law Judge ("ALJ") Eskunder Boyd, at which the plaintiff

and a vocational expert testified. (Tr. 45-74). On May 1, 2018, the ALJ issued an unfavorable

decision denying the plaintiff's claim for benefits. (Tr. 31-44). The plaintiff requested review from

the Appeals Council, and on August 20, 2019, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5).

On September 23, 2019, the plaintiff, proceeding *pro se*, filed her complaint in this pending action (Doc. No. 1), followed by an amended complaint, filed on October 17, 2019. (Doc. No. 13). On February 17, 2020, counsel appeared for the plaintiff and, on the same date, the plaintiff filed her Motion to Remand (Doc. No. 20), Statement of Material Facts (Doc. No. 20-1), brief (Doc. No. 20-2), and exhibits in support (Doc. Nos. 20-3 – 20-5). The next day, the plaintiff filed a corrected Motion and brief in support. (Doc. No. 21 ["Pl's Mem."]). On March 9, 2020, the defendant filed his Motion to Affirm (Doc. No. 23), with a brief in support (Doc. No. 23-1 ["Def.'s Mem."]), and his Statement of Material Facts. (Doc. No. 23-2). Two days later, the plaintiff filed a reply brief (Doc. No. 24) with exhibit in support (Doc. No. 24-1).

For the reasons stated below, the plaintiff's Corrected Motion to Remand (Doc. No. 21)[1] is GRANTED and the defendant's Motion to Affirm (Doc. No. 23) is DENIED.

## II.   FACTUAL BACKGROUND

As of the plaintiff's alleged onset date of disability, the plaintiff was thirty-three years old and was living with her mother. (*See* Tr. 51-52, 252, 360). She attended college for two years, and the last job she held, which she had for approximately eight years prior to her onset of disability, was part-time work as a call center representative. (Tr. 243 (reporting 2 years of college); *but see* Tr. 53 (completed high school); *see also* Tr. 298)). She received accommodations in that job. (Tr. 307).

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the parties' respective Statement of Facts. (Doc. Nos. 20-1, 23-2). Though the Court

---

[1] The plaintiff's initial Motion to Remand (Doc. No. 20) is denied as moot in light of the corrected motion.

has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

## III.   THE ALJ'S DECISION

Following the five-step evaluation process,[2] the ALJ found that the plaintiff met the insured status requirements through December 31, 2021 (Tr. 36), and that the plaintiff had not engaged in substantial gainful activity since her alleged onset date of May 9, 2016. (*Id.*, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).

At step two, the ALJ found that the claimant had the following severe impairments: idiopathic scoliosis, "status post underwent rod removal and spinal fusion," and Graves' disease. (Tr. 37, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

The ALJ concluded at step three that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. (Tr. 37).

---

[2] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

At step four, the ALJ concluded that the claimant had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that she required a sit/stand option involving sitting for thirty minutes, alternating to a standing position for five minutes, then sitting again. (Tr. 37). She could never climb ladders, ropes or scaffolds; she could occasionally climb stairs, ramps, balance, stoop and crouch; she could never kneel or crawl; she could not be exposed to cold or wetness; and, she required a cane for ambulation. (*Id.*). The ALJ concluded that the plaintiff was capable of performing her past relevant work as a callout operator, which work did not require the performance of work-related activities precluded by the plaintiff's RFC. (Tr. 39-40). Specifically, the ALJ concluded that the testimony of the vocational expert regarding the plaintiff's past relevant work was consistent with the Dictionary of Occupational Titles with the exception of the sit/stand options and the use of a cane, which the ALJ "accept[ed]." (Tr. 39, citing 20 C.F.R. §§ 404.1565 and 416.965).[3] Accordingly, the ALJ concluded that the claimant was not under a disability at any time from May 9, 2016, through the date of his decision. (Tr. 40, citing 20 C.F.R. §§ 404.1520(f) and 416.920(f)).

## IV.   STANDARD OF REVIEW

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a

---

[3] In response to the hypothetical posed by the ALJ, the vocational expert testified that a person capable of performing light work, with the ability to stand/walk for up to four hours, sit for six hours, with a sit/stand option to sit for thirty minutes, alternate to a standing position for five minutes, then resume sitting, and no climbing ladders, scaffolds or ropes, occasional balancing, stooping and crouching, and no exposure to cold or wetness, could perform the job of a callout operator as generally performed and as the plaintiff performed that job. (Tr. 70-71). The vocational expert testified that if such person ambulated with a cane, that would have no impact on the person's ability to perform that job (Tr. 71), and if such person was limited to sedentary work, with the same sit/stand options, that person could perform the job of a callout operator as the plaintiff performed it. (Tr. 71-72).

The vocational expert testified that if an individual had a sit/stand option such that she could sit for thirty minutes and alternate to a reclining position for ten minutes, that would eliminate all work, and if such a person would be absent three or four days a month, that, too, would eliminate all work. (Tr. 72).

correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d. Cir. 2012) (citation & internal quotation marks omitted); *see* 42 U.S.C. § 405(g). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation & internal quotation marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation & internal quotation marks omitted). Upon review, it is not the court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff argues that the ALJ erred in several respects, all of which impacted the ALJ's step four determination of the plaintiff's RFC and limitations. Specifically, the plaintiff maintains that the ALJ erred in his RFC determination in that he failed to consider the physical therapy evidence which reflected how long the plaintiff could sit and stand, whether she could stand unassisted, and how much and how fast she could walk. (Pl.'s Mem. at 4-7). The plaintiff also claims that the physical therapy evidence was consistent with other objective evidence in the record and did not support the hypotheticals posed to the vocational expert. (Pl.'s Mem. at 7-15). In addition, the plaintiff asserts that the ALJ erred in discounting the plaintiff's testimony in favor of

the medical records because these records actually support the plaintiff's allegations of pain. (Pl.'s Mem. at 17-21; *see also* Doc. No. 24 at 1-3). Finally, the plaintiff argues that the case should be remanded for further development of the record, including re-contacting Dr. Babu Kumar. (Pl.'s Mem. at 15-17).

In response, the defendant argues that the ALJ properly considered the plaintiff's physical therapy records and the objective clinical findings in his RFC determination. (Def.'s Mem. at 6-10; *see also id.* at 4-6). The defendant counters that the ALJ properly relied on the vocational expert's testimony that the plaintiff could perform her past work as a callout operator, as the plaintiff actually performed that job. (Def.'s Mem. at 16-18). Additionally, according to the defendant, the ALJ appropriately evaluated the plaintiff's allegations about her symptoms and reasonably found that "her assertions of a complete inability to work conflicted with other evidence." (Def.'s Mem. at 13-16). Finally, the defendant responds that the ALJ properly developed the record and did not need to re-contact Dr. Kumar because his opinion would not have changed the outcome of the ALJ's decision. (Def.'s Mem. at 10-13).

A.      THE ALJ ERRED IN HIS RFC DETERMINATION

The RFC "is an assessment of 'the most [the disability claimant] can still do despite [his or her] limitations.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting 20 C.F.R. § 404.1545(a)(1)). An RFC is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1).

In his decision, the ALJ concluded, after "[c]onsidering the claimant's treatment history, the objective clinical findings, the claimant's subjective complaints, and all of the medical opinions and evidence of record[,]" that the plaintiff retains the capacity to perform sedentary

work with limitations.  (Tr. 38-39).[4]  As discussed below, the ALJ's RFC determination is not based on substantial evidence in the record.

The plaintiff underwent two surgeries for scoliosis; the first at age 12, in January 1996, and the second in 2016, following a hardware failure at the L3-L4 facet.  (Tr. 400-14, 471-73).  Prior to her second surgery, performed by Dr. Jonathan Grauer at the Yale New Haven Hospital Spine Center on May 9, 2016, the plaintiff reported back pain, aggravated by standing, walking, bending, kneeling, exercising and laying on her back.  (Tr. 476, 480).  The plaintiff went into respiratory failure during her second surgery and was transferred to intensive care.  (Tr. 414-70, 807-10).  She experienced further complications following the surgery and received physical therapy at home. (Tr. 395-98, 812-16). On July 18, 2016, she began physical therapy at Rehabilitation Services at the Spine Center, with Laura Strassguetl, DPT, OCS, upon referral from Dr. Grauer.  (Tr. 388-92).  The bulk of the medical records are physical therapy treatment records.

The opinions of physical therapists are not opinions from an "acceptable medical source[,]" and thus, cannot be assigned controlling weight. *Parsons v. Berryhill*, No. 3:17 CV 1550 (RMS), 2019 WL 1199392, at *9 (D. Conn. Mar. 14, 2019) (citing *Cascio v. Astrue*, No. 10 CV 5666 (FB), 2012 WL 123275, at *3 (E.D.N.Y. Jan. 17, 2012); 20 C.F.R. § 404.1513)). As an opinion from an "other source," however, a physical therapist's opinions are "entitled to some weight."  *Id.*; *see also* Social Security Ruling 06-3p, 2006 WL 2329939, at *5 (S.S.A. Aug. 9, 2006) ("The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts of each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all of the

---

[4] "'Sedentary work is defined as involving only occasional standing and walking, the lifting of no more than ten pounds at a time, and the occasional lifting and carrying of light objects.'" *Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003) (summary order) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998)); *see* also 20 C.F.R. § 404.1567(a).

evidence in that particular case.").

The physical therapy records in this case do not contain medical opinions, but rather, are contemporaneous treatment records.  This is particularly important given that an ALJ must consider "objective medical evidence" when "determining the extent to which [a plaintiff's] symptoms limit [the] capacity for work." 20 C.F.R. § 404.1529(c)(2). Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as *evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption*. Objective medical evidence of this type is a useful indicator to assist [the Commissioner] in making reasonable conclusions about the intensity and persistence of [the claimant's] symptoms, and the effect those symptoms, such as pain, may have on [the claimant's] ability to work."  *Id.* (emphasis added). Thus, the ALJ must consider the objective evidence contained in these treatment records.

In his decision, the ALJ addressed the plaintiff's physical therapy treatment in a brief and limited fashion.  Specifically, he noted only that her physical therapy treatment was "interrupt[ed]" because of fatigue, shortness of breath, and tachycardia. (Tr. 39).  He then stated that, by October 2016, she no longer had palpitations, she showed normal motor strength, and she received medical clearance to return to her past work.[5]  (*Id.*). He relied on what he described as treatment records

---

[5] On October 5, 2016, the plaintiff asked for a letter from her surgeon, Dr. Jonathan Grauer, to be cleared to return to work. (Tr. 323, 639).  The record reflects that the plaintiff's primary care physician, Dr. Babu Kumar, requested a letter stating that the plaintiff was cleared and able to work full time, with normal activities. (*Id.*).  The plaintiff's previous work, however, was not at full-time capacity. (Tr. 55).  Dr. Grauer's office contacted the plaintiff and "clarif[ied]" that the last note she was given was to work "[two] days a week for [two] hour shifts." (*Id.*). Although the ALJ stated in his decision that the claimant was cleared to return to full-time work at that point (Tr. 38), Dr. Grauer, who treated the plaintiff for her back impairment, clarified to the plaintiff that she was only cleared to "work [two] days a week for [two] hour shifts[,]" and that, given her new diagnosis of Graves' disease, she would need to ask Dr. Peter if she could return to her previous desk job. (Tr. 323).  Dr. Grauer did not release the plaintiff to "full time work." (*See* Def.'s Mem. at 5).

Moreover, as the plaintiff testified, her previous *part-time* employer had accommodated her limitations by providing different chairs, being flexible in her work schedule, and allowing her to call out or leave early, or call in sick as needed without terminating her position. (Tr. 68).

from other providers reflecting an antalgic gait, but also reflecting 5/5 strength in her lower extremities. (*Id.*). He concluded that the advice to the plaintiff to incorporate low impact aerobic activities "reflect[ed] the medical judgment that the claimant could increase h[er] activity level." (*Id.*). Additionally, he relied on records from Dr. Kumar's office which showed findings for normal strength to her extremities, and he noted that the plaintiff received symptom relief from an epidural steroid injection. (*Id.*). It is clear from his decision that the ALJ did not consider the substance of the physical therapy notes or their consistency with the other assessments in the record.

The ALJ is correct that the plaintiff's physical therapy treatment in 2016 was "interrupt[ed]" because of symptoms associated with her Graves' disease, but he erred in disregarding the substance of the physical therapy records. In particular, he erred in rejecting the assessments contained within those records in favor of limited assessments regarding the plaintiff's strength and symptom relief, and in concluding that the plaintiff received medical clearance to return to her past work. Moreover, his interpretation of a "medical judgment" was inconsistent with the plaintiff's treatment records. Accordingly, the ALJ's decision is not supported by substantial evidence.

The initial physical therapy records, starting in July 2016, revealed that the plaintiff had increased low back pain that limited her activities of daily living and her quality of life. (Tr. 389). She could walk one to two blocks with a rolling walker once a day with frequent rest breaks, and she reported difficulty standing and walking, which she could only do for less than five minutes. (*Id.*). Her pain was aggravated by standing, walking and sitting. (*Id.*). She was assigned a score of 34 on the Oswestry Low Back Pain Scale.[6] (Tr. 390).

---

[6] A score of 33 signifies 20%-40%: moderate disability. "The patient experiences more pain and difficulty with sitting, lifting and standing. Travel and social life are more difficult[,] and they may be disabled from work. Personal care,

The plaintiff was seen regularly for physical therapy from July to August 2016. (Tr. 373-88). On July 21, 2016, she reported sharp pain, and although by July 26, 2016, she had increased her activity in the house and was able to cook dinner, her pain rating was an eight out of ten, and she could not ambulate without an assistive device. (Tr. 384). On August 4, 2016, the plaintiff had improved tolerance to standing and walking, but was limited with prolonged sitting. (Tr. 377-78). Her physical therapist sought to increase the plaintiff's lumbar active range of motion and lower extremity strength so that she could tolerate ambulation without an assistive device or cane, and she maintained a goal of being able to stand for ten minutes without a rolling walker assistive device or cane. (Tr. 373). On August 16, 2016, the plaintiff had difficulty grooming, dressing and showering, and she reported quick fatigue with activity. (Tr. 368). Muscle testing on the right and left knees and hips showed some deficits. (Tr. 370). Her gait was slow, and her Oswestry Low Back Pain scale was 33. (*Id.*). She was assessed with pain, lower extremity strength deficits, gait dysfunction, and difficulty with ambulation, transfers, standing and sitting. (Tr. 370).

On August 26, 2016, the plaintiff reported increased shortness of breath on exertion, and manual muscle testing showed lower extremity strength deficits and gait dysfunction. (Tr. 366). Her Oswestry Low Back Pain Scale was 33, and rising to a standing position from a seated position was guarded, painful and required the use of upper extremities. (*Id.*). Her physical therapist noted that since the last progress note, the plaintiff had made no significant progress in her lumbar spine range of motion, lower extremity strength or pain. (Tr. 785). She had reached "maximum physical therapy benefit and [was] appropriate for discharge for alternative interventions." (Tr. 785). The

---

sexual activity and sleeping are not grossly affected, and the patient can usually be managed by conservative means." *See* Doc. No. 20, Ex. A. http://www.rehab.msu.edu/_files/_docs/oswestry_low_back_disability.pdf. While the defendant emphasizes that this score reflects only "moderate" disability, the ALJ did not consider this score at all. It is well settled that a reviewing court "'may not accept appellate counsel's post hoc rationalizations for agency action.'" *Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009) (summary order) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (additional citation omitted)).

ALJ's decision erroneously suggested that the plaintiff's physical therapy treatment ended here.

Later in the day on August 26, 2016, the plaintiff was admitted to the emergency room with shortness of breath; she was diagnosed with primary hyperthyroidism. (Tr. 332, 339). On August 28, 2016, Dr. Patricia Peter, an endocrinologist, began treating the plaintiff's Graves' disease, and associated eye disease, which required the use of artificial tears. (Tr. 15-16).[7] A week later, on September 1, 2016, Dr. Peter's office noted that, if the plaintiff returned to school, she would need accommodations. (Tr. 328).[8]

By November 8, 2016, six months after her May 9, 2016 surgery, the plaintiff reported to Dr. Grauer that her pain was at a ten on a scale to ten, and upon examination, she had numbness in her left thigh. (Tr. 635-36). She was doing "much better than before surgery," but still had "ongoing symptoms." (Tr. 636). Her endocrinologist authorized her to resume physical therapy now that her Graves' disease was no longer acute (Tr. 635-36), so Dr. Grauer referred the plaintiff back to physical therapy. (Tr. 636). The ALJ did not consider any of the following physical

---

[7] The medical evidence supports the ALJ's conclusion that the plaintiff did not show any complications from Graves' disease during the relevant period (Tr. 39) as treatment records from Dr. Peter on September 22, 2016 showed improvement (Tr. 325), and records on October 18, 2016, reflected that the plaintiff no longer had palpitations, and her heat intolerance and her tremor had improved. (Tr. 321, 637). However, records from two months later, on December 20, 2016, reflect that the plaintiff still had palpitations due to her hyperthyroidism. (Tr. 619-21). Additional records evidencing continued symptoms post-date the ALJ's decision and were not considered by the Appeals Council. Specifically, the plaintiff was seen by Dr. Babu Kumar for hot flashes and palpitations due to her hyperthyroidism on September 29, 2017. (Tr. 857). Additionally, on July 25, 2018, Dr. Peter noted that the plaintiff lost seven pounds unintentionally since February, continued to feel shortness of breath and palpitations in hot weather, continued to have dry eyes, and had been choking on liquids. (Tr. 17). Dr. Peter recommended a total thyroidectomy given her eye disease. (Tr. 15).

[8] A month later, on October 5, 2016, the plaintiff asked for a letter from her surgeon, Dr. Grauer, to be cleared to return to work. (Tr. 323, 639). The record reflects that the plaintiff's primary care physician, Dr. Babu Kumar, was requesting a letter stating that the plaintiff was cleared and able to work full time, with normal activities. (Id.). The plaintiff's previous work, however, was not at full time capacity. (Tr. 55). Dr. Grauer's office contacted the plaintiff and "clarif[ied]" that the last note she was given was to work "[two] days a week for [two] hour shifts." (Id.). Although the ALJ stated in his decision that the claimant was cleared to return to full-time work at that point (Tr. 38), Dr. Grauer, who treated the plaintiff for her back impairment, clarified to the plaintiff that she was only cleared to "work [two] days a week for [two] hour shifts[,]" and that, given her new diagnosis of Graves' disease, she would need to ask Dr. Peter if she could return to her previous desk job. (Tr. 323). Dr. Grauer did not release the plaintiff to "full time work." (See Def.'s Mem. at 5).

therapy records in his decision.

On November 16, 2016, the plaintiff underwent a physical therapy evaluation at Yale Rehabilitation for lumbosacral spondylosis with low back pain radiating into her left leg. (Tr. 632). Her pain was aggravated by prolonged standing, walking, sitting and bending. (*Id.*). She ambulated with a cane and needed it to get in and out of bed, up and down from a chair, and to climb stairs. (*Id.*). Her pain, which was sharp and stabbing in her right low back and right thigh, was alleviated by position changes, heat and pain medications, and was aggravated by sitting, bending, lifting, standing and walking. (*Id.*). She had limited flexion and range of motion (Tr. 632-33), and the Oswestry Low Back Pain Scale score was 30. (Tr. 633). She had hip range of motion restrictions, lower extremity strength deficits and deconditioning which made it difficult to participate in activities of daily living, standing, walking and sitting due to pain. (*Id.*). The physical therapist's goals were to increase the plaintiff's lumbar extension active range of motion and lower extremity strength to allow her to tolerate ambulating without a cane, to improve pain, and to participate in activities of daily living. (Tr. 633).

The plaintiff attended physical therapy regularly, and the records reflected difficulty walking and sitting, and reduced range of motion of her lumbar spine. (Tr. 627). On December 13, 2016, the plaintiff reported limited activities of daily living due to pain (Tr. 625), and two days later, upon examination, she had reduced lumbar spine flexion at twenty degrees, and extension at five degrees. (Tr. 623). A week later, on December 21, 2016, Dr. Grauer noted that the plaintiff's gait was slow, and she had an increase of back discomfort with extension to her left leg diffusely. (Tr. 617-18). Dr. Grauer referred the plaintiff for pain management.

On January 27, 2017, the plaintiff began treatment with Dr. Rajat Sekhar at Yale Pain Management. (Tr. 609-15). Dr. Sekhar discussed the "potential benefit of low impact aerobic

exercise[,]" and recommended conservative measures such as massage, acupuncture and chiropractic care. (Tr. 610). He noted that she used a rolling walker, raised toilet seat and shower seat, and, with these aides, she was able to perform activities of daily living. (*Id.*). She had an antalgic gait, and she required a cane for ambulation. (Tr. 614-15).

She underwent a transforaminal epidural steroid injection under fluoroscopy in March 2017. (Tr. 677-78; *see* Tr. 615, 758). At a follow up appointment on April 18, 2017, the plaintiff reported that she had "30% improvement and continue[d] to benefit" from the injection, but that she continued to have "left leg pain and [could not] discern where it radiate[d] in the upper leg but the pain radiate[d] to the lateral calf and into the toes associated with tingling." (Tr. 674). She had an antalgic gait, but normal strength, and she was prescribed gabapentin for her pain. (Tr. 676).

The ALJ noted in his decision that the advice to the plaintiff to incorporate low impact aerobic activities, "reflect[ed] the medical judgment that the claimant could increase h[er] activity level." (Tr. 39). However, Dr. Sekhar's recommendation cannot stand alone. After her appointment with Dr. Sekhar, and following the injection, which the ALJ appropriately noted provided some relief (Tr. 39; *see* Tr. 676 ("30% benefit" from the transforaminal epidural steroid injections), albeit temporary (Tr. 62 ("[i]t gives me about a good week")), the plaintiff resumed physical therapy with the *goal* of increasing her activity level, but once again she had minimal success. Thus, although the ALJ was correct in noting that Dr. Sekhar discussed the benefits of low impact aerobic exercises with the plaintiff in January 2017, the treatment records, as discussed herein, reflected that the plaintiff had little to no success in increasing that activity level over time.

Upon referral from Dr. Sekhar, the plaintiff started aquatic therapy at Gaylord physical therapy on May 22, 2017. (Tr. 758). Notes reflect that the plaintiff had undergone three prior rounds of physical therapy with minimal to no success. (*Id.*). She had an altered gait, and she had

limited range of motion and reduced muscle strength.  (Tr. 758-59 (active range of motion of the lumbar spine for flexion was 15%, extension 25%, right side bend 15%, left side bend 25%), Tr. 758 (strength measurements were as follows: L2 hip flexion 3-, L3 knee extension 4, L4 ankle dorsiflexion 4-, L5 great toe extension for, S1 ankle eversion 3+, S2 knee flexion 3+, Transverse abdominus 3)). The physical therapist assessed the plaintiff with functional limitations in walking, standing, sitting and lifting, and she noted a "severe" decrease in lumbar range of motion, moderate loss in lower extremity strength and gait abnormalities that required the use of a cane for ambulation. (Tr. 759). She recommended aquatic therapy to improve strength and safety with gait and upright activities.  (*Id.*).

The plaintiff attended therapy sessions at Gaylord from May through August, with little improvement.  Her goal was to increase activity tolerance with activities of daily living at home and increase the ability to stand and walk on land.  (Tr. 766). Additionally, among her stated goals was to be able to perform full squats in the pool to improve her ability to pick up objects off the floor at home, and to be able to walk or ambulate for ten minutes in the pool so she could decrease her use of a cane outside the pool.  (*Id.*; *see also* Tr. 767).

On June 26, 2017, the Physical Therapy Orthopedic Progress note included active range of motion testing and muscle strength testing which reflected deficits in both, and functional limitations with bending, lifting, walking, which was done with a single point cane, and sitting for more than ten to fifteen minutes. (Tr. 768). She was assessed with minimal increases in lumbar range of motion and lower extremity strength, and minimal functional increases.  (*Id.*).  Because her short-term goals had not been met, her physical therapist recommended dry needling treatment for pain relief. (Tr. 769).

By July 19, 2017, the plaintiff still had not met her short-term physical therapy goals (Tr.

775), and on July 27, 2017, she had another injection, but again, by August, she was still unable to meet these short-term goals.  (Tr. 778, 782).  On August 24, 2017, her Physical Therapy Orthopedic Progress Note reflected that "[s]ince the last progress note, patient has made no significant progress in lumbar spine range of motion, lower extremity strength or pain. . . . Patient also reported no functional changes since last progress note."  (Tr. 785-86).  The plaintiff had reached maximum physical therapy benefit so she was discharged for "alterative interventions[.]" (Tr. 786).  Range of motion testing showed no changes, and her muscle strength testing showed increased pain with hip flexion and knee flexion on the left side, with functional limitations with bending, lifting, walking using a straight single point cane, and sitting for more than ten to fifteen minutes.  (Tr. 784).  The plaintiff made "no significant progress" in lumbar spine range of motion, leg strength or pain. (Tr. 785).

The ALJ's disregard of all these records, which reflected the plaintiff's functional limitations, constitutes error requiring remand.  *See Robinson v. Saul*, No. 3:18 CV 1605 (KAD), 2020 WL 652515, at *8 (D. Conn. Feb. 11, 2020) (remanding for the ALJ's failure to consider, *inter alia*, "the observation of [the] [p]laintiff's physical therapist, . . . who stated that [the] [p]laintiff 'is significantly limited with functional activities including sitting, standing, walking, bending, carrying and lifting'" and requires rest breaks).  The ALJ's failure to evaluate the physical therapy records regarding key issues such as the severity of the plaintiff's impairments and their functional effect constitutes grounds for remand. *See Card v. Berryhill*, No. 3:18 CV 1060 (AWT), 2019 WL 4438322, at * 3 (D. Conn. Sept. 16, 2019) (remanding for failure to analyze a physical therapist's assessment, apply the factors in 20 C.F.R. § 404.1527(c)(1)-(c)(6), and weigh the assessment in relation to all available evidence); *see Kellams v. Berryhill*, 696 F. App'x 909, 918 (10th Cir. 2017) (remanding for failure to evaluate a physical therapist's functional capacity

evaluation on key issues such as impairment severity and functional effects even though the therapist was not considered an acceptable medical source pursuant to 20 C.F.R. § 404.1502(a)). Additionally, in failing to consider limitations identified in the physical therapy records, the ALJ relied on a hypothetical posed to the vocational expert that was not supported by substantial evidence. *See McIntrye v. Colvin*, 758 F3d 146, 151 (2d Cir. 2014) (holding that "[a]n ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflects the limitations and capabilities involved").

As discussed above, the ALJ did not address the physical therapy records which reflected that the plaintiff could not sit, stand or walk for more than fifteen minutes, and that her therapy had not improved her condition. (*See* Tr. 759 (noting "functional deficits including decreased walking, sitting, and stand tolerance and inability to don or doff socks and shoes without assistance from shoehorn due to limited motion and pain"), 768 (noting "minimal increases in lumbar ROM and LE strength with minimal reported functional increases by patient. . . . Pt has had 3 rounds of land-based PT in the past with minimal results so dry needling was brought up with patient today as an alternative treatment to traditional land-based physical therapy")). As the vocational expert testified in response to the ALJ's second hypothetical, if an individual had a sit/stand option such that she could sit for thirty minutes and alternate to a reclining position for ten minutes, such individual could not perform any work. (Tr. 72). The ALJ, however, disregarded this testimony.

Additionally, despite acknowledging that the plaintiff's former employer accommodated the plaintiff's limitations (Tr. 38; *see* Tr. 68-69 (former employee allowed her to alter chairs often, call out or leave early as needed)), the ALJ did not include those accommodations in his final RFC. In the first hypothetical posed to the vocational expert, the ALJ detailed an individual purportedly

capable of performing the plaintiff's past work as a callout operator both generally, and as she performed that job. (Tr. 70). However, the hypothetical upon which the ALJ relied in formulating his RFC was of an individual who ambulated with a cane and who was capable of performing sedentary work, with the ability to stand/walk for up to four hours, sit for six hours, with a sit/stand option to sit for thirty minutes, alternate to a standing position for five minutes, then resume sitting, and no climbing of ladders, scaffolds or ropes, with occasional balancing, stooping and crouching, and with no exposure to cold or wetness. (Tr. 70-71). The ALJ's hypothetical does not include the accommodations provided by her past employer, and the physical therapy records would not support the ALJ's assessment of the plaintiff's ability to remain in a standing position or to remain sitting. While there are volumes of references to the plaintiff's restrictions in the plaintiff's range of motion and her lower extremity weakness, there are no opinions documenting how they affected her RFC. The ALJ's hypothetical, therefore, is not supported by substantial evidence. *See McIntrye*, 758 F3d at 151.

Moreover, the ALJ's decision is not supported by substantial evidence given his reliance on limited entries to the exclusion of the plaintiff's extensive treatment records evidencing limitations to the contrary. *See Rodriguez v. Colvin*, No. 13 CV 1195 (DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016) ("It is grounds for remand for the ALJ to ignore parts of the record that are probative of the claimant's disability claim.") (citation & internal quotations omitted). Specifically, in his decision, the ALJ pointed to entries in the record reflecting "normal motor strength." (Tr. 38 (citing Tr. 322, 857, 860)). These records are from follow-up visits with: (1) Dr. Peter, the plaintiff's endocrinologist, who treated the plaintiff's Graves' disease, not her lumbar impairment (*see* Tr. 322); (2) Dr. Kumar, who, in that particular record, the plaintiff "was told to [see] by [her] endocrinologist because of ongoing hot flashes and palpitations" (Tr. 857);

and, (3) APRN Suni Jacob, who the plaintiff saw "to get a referral for a CT scan of her brain." (Tr. 860). The entries upon which the ALJ relies are the template entries under "Physical Exam" (Tr. 322) and "General Examination." (Tr. 857, 860). These providers were not assessing the plaintiff's strength and range of motion due to her back impairment, but rather, as reflected in the treatment record, were assessing the plaintiff's hyperthyroid symptoms and memory problems. (Tr. 322, 860).

The one record upon which the ALJ relied that was related to medical treatment for her back pain was the February 2, 2018 treatment note for APRN Jacob in which he found the plaintiff's upper and lower extremity motor strength "normal." (Tr. 862). What is notable about that record, however, is that the plaintiff relayed to APRN Jacob that her back pain was triggered by *stretching*, and she sought treatment at a walk-in clinic and was prescribed Tramadol for relief. (*Id.*). APRN Jacob noted lumbar tenderness upon examination (*id.*), and he sent her for an MRI. The MRI, performed on April 6, 2018, revealed, "mild facet arthropathy at L5 S1" worse on the left, and increased T2 signal in the paraspinal muscles below L3 likely related to denervation. (Tr. 863-64). The ALJ did not consider the cause of the plaintiff's back pain, he did not reference the consistency of this record with the physical therapy records, and he did not consider the objective MRI results that supported the plaintiff's allegations of pain.

Similarly, the ALJ did not reference the treatment records from Dr. Kumar from the times he treated the plaintiff's back pain. (Tr. 850, 855 865). In those records, Dr. Kumar noted that, consistent with the physical therapy records, the plaintiff had tenderness, paraspinal muscle spasm, and limited movement. (*Id.*).[9]

---

[9] On August 6, 2018, Dr. Kumar authored a note stating: "Akira Keaton is a patient of mine who is under my care for multiple medical conditions. She is unable to work. If you have any questions, please feel free to contact me at the number below." (Tr. 14). The plaintiff asserts that the ALJ had a duty to develop the record by re-contacting Dr. Kumar in light of his conclusion that the plaintiff was unable to work, and his invitation to be contacted. (Pl.'s Mem.

After the ALJ issued his decision, the plaintiff submitted additional records supporting her allegations of back pain to the Appeals Council.  New evidence that is submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision.  *See Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996).

According to these records, on July 19, 2018, the plaintiff was seen at the Orthopedic Clinic for her back pain.  (Tr. 20).  Upon examination, the provider noted moderate pain to palpation of the lumbar spine, and moderate pain with extension and flexion.  (Tr. 21).  Her sacroiliac joint or hip was positive for pain to palpation bilaterally, and she had an antalgic gait. (*Id.*).  She was assessed with chronic low back pain, with lumbar radicular pain, sacroiliac joint pain, and myofascial pain, and she was given Tramadol and lidocaine patches.  (*Id.*).  She was scheduled for caudal steroid injections and nerve blocks on the right and left L5 primary dorsal rami and lateral branches of S1-L3. (Tr. 22).

This more recent evidence is consistent with the plaintiff's treatment history of pain management, which included prescription medications, injections and physical therapy.  Her extensive treatment is not conservative treatment, and it should have been considered by the ALJ as evidence of the severity of the plaintiff's pain.  *See Jazina v. Berryhill*, No. 16 CV 1470 (JAM), 2017 WL 6453400, at *6 (D. Conn. Dec. 13, 2017).

Additionally, the ALJ reviewed and assigned "little weight" to the opinions of the State agency physicians, Dr. Nisha Singh and Dr. Firooz Golkar, who stated on November 2, 2016 and May 10, 2017, respectively, that the plaintiff was capable of performing light work. (Tr. 39; *see*

---

at 15-17). Dr. Kumar's limited opinion was properly afforded little weight as the ultimate issue of disability is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  For reasons stated in this decision, the ALJ had a duty to obtain a medical opinion about the plaintiff's functional limitations.

Tr. 80-82, 88-89, 99-100, 108-09).  The ALJ appropriately concluded that their findings did not account for "reduced stand/walk" or the need to ambulate with a cane. (*Id.*). In addition, however, the ALJ should have considered that the agency physicians did not have the benefit of the 2018 physical therapy records which showed that the plaintiff did not reach the level of improvement anticipated, and that her pain continued to be documented and treated through pain medication, physical therapy, and injections. *See West v. Berryhill*, No. 3:17 CV 1997 (MPS), 2019 WL 211138, at *5 (D. Conn. Jan. 16, 2019) (holding that the ALJ  "may not credit a non-examining physician's opinion over that of a treating physician's where the non-examining physician's opinion considered less than the full record and the subsequent medical evidence may have altered the opinion").

The ALJ is instructed on remand to consider the extensive physical therapy records, and to make reasonable efforts to obtain updated opinions from an agency source, and a consultative physician or other acceptable medical professional who has reviewed the plaintiff's entire medical history and can opine on the plaintiff's exertional and postural limitations.  *See Robinson*, 2020 WL 652515, at *11 (citing *Jazina*, 2017 WL 6453400, at *7  (ordering remand after determining that "[t]he ALJ erred in assigning significant weight to the state agency medical consultants' under-informed opinions" where they failed to review the entire record and did not consider the opinions of the plaintiff's treating physicians, and further noting that "[t]he ALJ may also decide to request an updated assessment from a state agency medical consultant, after the consultant has the opportunity to review all of the information in the record, including the treating physicians' opinions"); *see also McGlothin v. Berryhill*, No. 1:17-CV-00776 (MAT), 2019 WL 1499140, at *4–*5 (W.D.N.Y. Apr. 4, 2019) (ordering ALJ on remand "to obtain an updated opinion from a consultative physician or other acceptable medical source regarding all of Plaintiff's exertional

and postural limitations" where the court determined that the consultative physician's opinion was stale for failing to account for the Plaintiff's entire medical history).

    A.    <u>OTHER ARGUMENTS</u>

Although the plaintiff's brief identifies additional challenges to the ALJ's decision regarding the plaintiff's allegations of pain, the Court need not address them given that the "case must return to the agency either way for the reasons already given, [so] the Commissioner will have the opportunity on reman to obviate th[ese] dispute[s] altogether by" addressing the remaining arguments on remand. *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 94 (2d Cir. 2019).

**VI.**    <u>CONCLUSION</u>

For the reasons stated below, the plaintiff's Corrected Motion to Remand (Doc. No. 21)[10] is GRANTED such that this matter is remanded for additional proceedings consistent with this Ruling and the defendant's Motion to Affirm (Doc. No. 23) is DENIED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

Dated this 15th day of September, 2020 at New Haven, Connecticut.

                                          <u>/s/Robert M. Spector, USMJ</u>
                                          Robert M. Spector
                                          United States Magistrate Judge

---

[10] *See* note 1 *supra*.